Will the clerk please call the last case. 117-0821, Carl Schmitz v. Harrisons Poultry Counseling may proceed. Thank you. Good afternoon, Justices. Patrick J. Jesse on behalf of the appellant, Harrisons Poultry. Counsel. The sole issue before you today is whether the commission's decision denying the claimant a wage differential under Section 8D.1 was against the manifest way of the evidence. We submit that that decision was not against the manifest way of the evidence. As you know, we're here as a circuit court to reverse the commission's decision. And again, we submit that the commission's decision was correct and it should be affirmed under the manifest way of the evidence. Can we focus on what I think is critical here? Sure. Obviously, the commission decided that his earning capacity was not reduced. They decided he was not entitled to a wage differential benefit. Yes. So tell us, if you can, what evidence is there that his earning capacity was not reduced? The evidence is in conflict. And as you know, there's a preference for a wage differential by the Supreme Court's decision versus the PPD. So tell us why his earning capacity was not reduced. Succinctly put, Justice Hudson, there's an opinion from a vocational expert who testified that he could earn between $40,000 and $70,000 a year. His average weekly wage was established pursuant to the decision as somewhere around $67,000, which falls into that range. Now, I would submit that that would be an inference that the commission could draw, that there is no wage impairment. Certainly, the commission didn't buy the gentleman's argument with respect to his minimum wage job. And again, it was for looking for the brother-in-law. Correct. His position was that was the best he could do. That was his argument, and the commission said, you know, there's conflicting evidence to the contrary in these labor market surveys, the vocational opinion. We're not going to give as much weight to the petitioner's testimony. This is the best job I can do. This is the best rate I can earn. We're going to adopt these opinions. So they went with basically Bishop's opinion. That's essentially what they did. Was there also a credibility issue as I was reviewing this? Did they say that the claimant lacked some credibility regarding his job search? Absolutely. And what was that about? Well, he testified. I mean, this gentleman worked as a butcher. He was in the food industry. I don't think anybody disputes that. I mean, 80% of his day he was cutting poultry. Obviously, he had to do some loading and unloading. We understand that. He was apparently looking for jobs based upon these labor market surveys. The jobs primarily were in the food industry. And then he testified on the cross that I really didn't look for jobs in the food industry. I only applied three or four. And that was his background. That was where his appearance was. 35 years. And Bishop even testified this would have given him the best opportunity to return at the rate of what he was commensurate with what he was earning for Harrison's. So, I mean, you take all that into account. You've got credibility. You have an expert opinion. You have conflicts about it. It's regarding the gentleman's capacity to earn. It's a manifest way issue. So did the trial court then substitute his judgment for that of the commission? Yeah, absolutely. I would 100% agree with that. I'm just asking. I haven't concluded that. Well, I know. It's sort of a rhetorical question. No, but they did. I mean, one, I don't think the trial court really understood the manifest weight standard. And, two, I think they just substituted their judgment. I mean, at the end of the day, as we know, there's no right or wrong answer sometimes to manifest weight. It's a question of whether there's a sufficient basis in the record for the commission to rule. And they did. And there is. I mean, the unrebutted vocational testimony in this case and the claims testimony that was less than credible. All right, let me ask you this. I recall reading somewhere, when he left his employment for the meat-cutting business and before he started working as a landscaper for his brother-in-law, didn't he have some other interim job where he made significantly more than the landscaping business? I wouldn't necessarily call it significantly more, but $12 an hour or more. Yeah. And that was something else the commission relied upon, rejecting his position that the best he could do was $8.25. And that job was what? That was for Jeff Power. What was he doing? He said he was supervising two gentlemen. And they were basically moving a warehouse from, I believe, Elk Grove Village to Gurnee, Illinois, and it was some airplane parts. Obviously, it wasn't the food industry. And he obtained that position relatively shortly after he was released from medical treatment, given permanent restrictions. I don't know if the commission so much relied upon that. I mean, it is in their opinion that, hey, you know, one month before you started working for your brother or a couple months before, you were making $12 an hour. His brother-in-law. His brother-in-law, correct. Sorry. Yeah. But other than that, I think there's definitely sufficient facts in the record and evidence in the record for which the commission could have relied upon, which they did rely upon. And under Manifest Weight Standard, we have to reinstate that decision. And I think it was an error, obviously, that the circuit court to reverse that. And I would ask that the court reinstate the commission's decision in this case in its entirety. I don't have anything further. Thank you, counsel. You will have time to reply. Thank you. Counsel may respond. Everybody's thirsty today. Everybody's thirsty. Yeah, I must feel the dryness with the heat and everything. Still recovering from the Super Bowl. Counsel, may I please the court? My name is Kevin Botha. I represent Carl Schmitz in this case. He's the petition and the appellee. Nothing will make Mr. Schmitz whole again in this matter. We're just asking that this court make him as whole as possible. The obituary of the commission did not review critical evidence in this case and denied Mr. Schmitz wage differential benefits. Judge Collins, though, judiciously reversed that decision, and she reviewed all the evidence in this case and came to the conclusion that the loss of conclusion was clearly apparent. And she reversed the commission decision based upon the fact that it was against the manifest way of the evidence. The commission made three findings that Mr. Schmitz was not partially incapacitated from performing his usual and customary line of employment. And they stated three findings. One, his previous job earning $12 an hour. Two, that he lacked credibility in his claim of inability to find employment within his restrictions. And three, the testimony of Charlotte Bishop that he could earn anywhere between $40,000 and $70,000 a year. And I'll come back to that when I get to the earnings capacity because I feel that, firstly, those elements do not pertain to whether or not he is partially incapacitated from pursuing his usual and customary line of employment. Let's proceed on the assumption that you might be correct on that. He was partially incapacitated. Let's focus on the wage differential. As you alluded to, you said you're going to get to it. You had Bishop. She testified that in the food industry, that based on his experience, knowledge, skills, there were, you know, many jobs that were available to him, and he chose not to get those jobs. So what do you have to say about that? I think choosing not to get those jobs is a Well, maybe not choosing not to get them, but the commission found that out of the 100 jobs that he applied for, 70 or 80 were managerial-type positions. So they were troubled by that. That is true. And the commission also alluded to the fact that he only applied for three or four jobs in the food service industry, which he had been in. But that was his testimony. This was four years after he did his job search. If you look at his job search logs, which is contained in the evidence and also in the appendix, there were specific jobs that he applied to in the food industry, no less than 24 jobs. So that's, you know, that's a big difference between two or three. Yes, his testimony was two or three, but the job search logs that were made contemporaneously with his job search established that he looked for at least 24 jobs in the food service industry, indicating that the commission's decision was not based upon their review of all the evidence in this case. Well, let me ask you this. There was an issue there the commission raised that they found that his testimony regarding his job search efforts was inconsistent. To my understanding, he initially testified he looked for a minimum of 10 jobs a week, but then when he was examined later, he changed his testimony to five jobs per week after his job search logs were examined. Is that true? Yes, I think that's true. You know, when he was testifying to that, he never had the benefit of having his job logs in front of him. So he was never referring to the job logs provided as evidence. And the job logs, they were not, it was agreed between the parties that the job search logs were going into evidence. And if you review the record, we agreed that we never even had to establish the foundation for those logs going in, as both parties agreed that they would just go on as existence. Can I ask you a question? Yes. Where did the trial court get the authority to set the wage differential? Where did that authority come from? If the trial court wanted to find that failure to give a wage differential was against the manifest way of the evidence, the trial court would have been required to send it back to the commission to set the wage differential. Where did she get the authority to set it at $545.59 a week? Following her decision, Your Honor, we filed a motion for clarification. No, I understand what you did. As to what the calculation would be. Where did she get the authority to make the calculation? Because the commission has to determine not what he was making, not only what he was making, but what he could have been making at the time. And is it $12 an hour? Is it minimum wage $8.25 an hour? Or is it $40,000 a year? What is it? Who picks it? Certainly not the trial court. Okay, well, you know, it was my motion. She could have, she did. Well, she can only do what she has the power to do. When she doesn't have the power to decide these issues, that's granted to the commission under the act, not to her. Okay, and so the case never went back down to the commission. I understand that. Thank you, Your Honor. So, staying on the earnings capacity, following his release to work with Bonilla Restrictions, he obtained this job on a temporary basis, making $12 an hour. Initially, he was hired just to supervise the move. He testified that it was a 90-day probationary period, and after that, he would possibly be involved in inventory control. It was a very technical inventory software, which he could not understand. In the 35 years that he worked at Harrison Poultry, he never, ever worked on a computer, never used a computer, had no computer skills. He even bought the software to try and learn it himself, to try and keep that job. So he was able to secure the job, earning $12 an hour. He just wasn't able to maintain it because of his lack of skills. And, you know, the argument is made that he's seeking a wage differential based upon minimum wage, which is inaccurate. If you look at his earnings at the time of trial, he was averaging $481.65 per week, based upon a 40-hour work week. That comes out to $12.04 per hour. So the job that he was actually working at his brother-in-law's landscaping company is kind of consistent with the job that he was earning before he checked out. The testimony of Charlotte Bishop that the petitioner could earn between $40,000 and $70,000 a year was cherry-picked from her deposition as well as her vocational reports. Well, is there something that prohibits the commission from doing that, so-called cherry-picking? No. Well, I don't think it's prohibited, as long as they weigh all her other testimony. They can't just take this testimony and ignore the rest. The first three labor market surveys all indicated an earnings potential that were within the range that Mr. Schmitz was earning at the time of trial. The first labor market survey done February 18, 2010 indicated salary ranges of earnings capacity from $25,000 to $67,000 per year. That's, in my opinion, a major change to his state. And you agree with those first three labor surveys, or you don't? Yeah. How much was he making working at the landscaping business? How much was he making a year working at the landscape business? Just over $25,000 a year. So if you agree with those assessments, that's like the minimum of that, and they go up to triple what he's making, right? Right. But the evidence establishes his earning capacity. The vocational rehabilitation specialist established his earning capacity in a range,  so, therefore, the commission should have concluded that his current earnings were within the range that the vocational. . . He hit the minimum, the bottom line of the range, you're saying? In some of the cases. . . So there's $25,000 in the first one was the bottom line. And then the September 2010 labor market survey on page 7, the earnings capacity identified jobs beginning at $9.50 an hour with several positions at $10 an hour, which is less than what he was making at his brother-in-law's job. And then another labor market survey identified jobs between $25,000 and $73,000 per year. The labor market survey that she opined where he could earn between $40,000 and $70,000 a year was done two years after . . . almost two years. It was August of 2013. He began work in October 2011. Almost two years after he began working for the brother-in-law's company. But the wages that he was earning at the time while working at the brother-in-law's company all fell within the ranges that she gave in her first three labor market surveys. Let me ask you a point of question. Who ultimately bears the burden of establishing an entitlement to a wage differential benefit? Whose burden is it? Petitioner. Okay. And the reason we never bothered getting our own vocational assessment was that her opinions were supporting of Mr. Schmitt's position in that his job making an average of $12 an hour fell within the range that she identified. So, therefore, it was not . . . We didn't need to spend the money on getting an additional vocational assessment and further delaying litigation with more depositions and more expenses for Mr. Schmitt. So, Judge Collins et al., I don't believe, substituted her own opinion or re-weighed the evidence. She, in her opinion, I think, looked at the case of Gallianetti versus Industrial Commission, the 2000 decision. And that case is almost analogous to the facts of this case. There, the guy had . . . He was a tree trimmer. He found a job making minimum wage. He had opinions of doctors that said he couldn't go back to his previous job. There was an F.C.E. that confirmed he couldn't go back to his previous job. And then there was also the issue of, well, the labor market surveys say you can earn more money than what you actually earn. He did apply for certain jobs, and those jobs were not available to him. And, you know, this court stated that there's no affirmative requirement by the petitioner to even conduct a job search. It's just merely one way of proving an impairment of earnings. So based upon the case law, especially in Gallianetti, where the appellate court reversed the commission's decision, finding that he was entitled to 60 percent of a person permanent partial disability, found that that was manifestly against the weight of the evidence, and reversed it and ordered wage differential benefits is exactly identical to the facts in this case. And, Your Honors, we just pray that you make Mr. Schmitz whole, and we ask that the circuit court's decision and opinion in order, in this case, be affirmed and remanded to the commission for further instruction. Thank you for your time. Just real briefly in reply, counsel talked about Gallianetti and the facts being analogous, but I believe in Gallianetti the labor market surveys that were actually performed determined that the job the gentleman went back to was appropriate. I could be wrong, but I know that it wasn't in Gallianetti. It was a completely opposite opinion from an expert saying this gentleman can earn significantly more money doing a different job, and we know that he can't do. Our expert testified. She said he can earn more than a $25 an hour or the minimum wage. And again, this is manifestly the commission's free to weigh the evidence. They're free to choose which expert they find to be more credible. Counsel admits he didn't put forth any vocational evidence of his own. Maybe the outcome would have been different. We don't know. But the commission rejected his client's testimony, found it not to be credible, relied upon the bishop's testimony, and that's who they hung their hat on. And in my opinion, I think that's the whole case in a nutshell, and I would just ask that the commission's decision be reinstated in its entireity. If there's any additional questions. I don't believe there are. All right. Thank you. Thank you, counsel, both for your arguments in this matter. We take that advisement. This position is issued.